**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| In re: | Chapter 11 |
| Gas POS, Inc. | Case No. 26-00362-DSC |
| Debtors. | |

**MOTION FOR ORDER: (A) ESTABLISHING BIDDING PROCEDURES; (B) SETTING EXPEDITED HEARING ON BIDDING PROCEDURES; AND (C) AUTHORIZING SALE OF PROPERTY OF THE ESTATE FREE AND CLEAR OF LIENS, LEASES AND OTHER INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES PURSUANT TO §§ 363 AND 365 OF THE BANKRUPTCY CODE**

**COMES NOW** Gas Pos, Inc., Debtor and Debtor in Possession ("Debtor") and moves this Court (the "Motion") to enter an order: (a) establishing bidding procedures; (b) setting an expedited hearing to approve the proposed bidding procedures; and (c) authorizing the sale of property of the estate free and clear of liens, claims, encumbrances, and other interests, and the assumption and assignment of certain executory contracts and unexpired leases, pursuant to §§ 363 and 365 of the Bankruptcy Code. In support of this Motion, Debtor states as follows:

## I. BACKGROUND

1. On February 2, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for protection (the "Bankruptcy") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

2. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157 (b).

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are §§ 105(a), 363(b), 363(f), 363(m) and 365 of

1370117 v2

the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure.

4. Prior to the Petition Date, the Debtor engaged in an efforts to market the Debtor's assets.

5. The Debtor has continued extensive discussion with potential buyers. The Debtor is continuing efforts to locate potential bidders and to provide information to potential bidders.

6. Pursuant to § 363 of the Bankruptcy Code, the Debtor has determined that a sale of substantially all of Debtor's assets (the "Proposed Sale") to GZ Mart, LLC (the "Purchaser") would be in the best interest of the Debtor's estate and creditors.

7. As more fully set forth herein, Debtor has entered into that certain Asset Purchase Agreement (as amended, the "APA") with the Purchaser under which the Purchaser will purchase the property (as hereinafter defined) for payment of the amount of One Million Dollars ($1,000,000); and the assumption of certain reclamation liabilities and liabilities related to certain assigned leases all as more fully described in the APA. A copy of the APA is attached hereto as Exhibit "A". To ensure that the Purchaser's offer represents the highest or otherwise best value to be derived from the Proposed Sale, Debtor has determined that it is in the best interest of its estate and all creditors to solicit competing bids and conduct an auction (the "Auction") of the Debtor's assets as further described below.

## II. DESCRIPTION OF ASSETS BEING SOLD

### A. Assets Sold Free and Clear

8. The assets to be conveyed in the sale are more fully described in the APA and shall be transferred free and clear of all liens, claims, interests, and encumbrances includes all of the following (collectively, the "Free and Clear Assets"):

(a) all of Debtor's right, title and interest in and to all of assets of every description owned by Debtor and used, usable or useful in the operations of the business operations of the Debtor, free and clear of all liens, claims, obligations and encumbrances; other than the Excluded Assets (as subsequently defined); and

(b) certain executory contracts and unexpired leases to which the Debtor is a party (as more particularly described in the APA, the "Assumed Contracts").

**B. <u>The Assets not Being Sold</u>**

9. Notwithstanding the forgoing, the Free and Clear Assets shall not include (i) any cash or cash equivalents of Debtor and the excluded assets under the APA and any agreement delivered in connection herewith including, without limitation. (ii) rights, and claims of Debtor that may be asserted as a defense, cross claim or counterclaim in any action, suit, proceeding that may be brought against Debtor and that relate to any liability or obligation of Debtor retained by Seller pursuant to the APA; (iii) Debtor's corporate books and records relating to its organization and existence; (iv) any materials containing privileged communications or information about employees, disclosure of which would violate and employee's reasonable expectation of privacy and any other materials which are subject to attorney-client or any other privilege or requirement to maintain confidentiality (including any rights to assert privilege); (v) any and all avoidance actions arising under applicable sections of the Bankruptcy Code; and (vi) any executory contracts or unexpired leases not included and requested by Purchaser to be placed with and among Leases to be assumed by and assigned to Purchaser; (collectively, the "Excluded Asserts").

**C. <u>The Purchased Assets & Purchase Price</u>**

10. Subject to the terms and conditions set forth herein and in the APA, Purchaser intends to purchase the Free and Clear Assets (but not the Excluded Assets) for a total purchase price of (i) payment of the amount of One Million Dollars ($1,000,000); and (ii) assumption of certain liabilities related to certain assigned leases all as more fully described in the APA (the "Purchase Price").

11. The Closing shall occur pursuant to the APA after receipt of all necessary Bankruptcy Court approvals and satisfaction of other closing contingencies as set forth in the APA, as amended, or at such other time as may be mutually agreeable to the parties.

## III. BIDDING PROCEDURES

### A. General Bidding Procedures

12. To appropriately evaluate competing bids and ensure an orderly Auction process it is necessary to establish certain uniform sale and bidding procedures. In this regard, Debtor intends to deliver a notice, as approved by the Court, of the proposed bidding terms and conditions (the "Sale Notice") to all parties who are known to have expressed an interest in the Free and Clear Assets or who Debtor otherwise believes may have an interest in a potential transaction. The Debtor shall file with this Court a proposed Sale Notice at least two days in advance of the hearing on this Motion.

13. Debtor proposes that the Auction be conducted on the following terms and conditions (sub-clauses (a) through (i) below, collectively, the "Bidding Procedures"):

a. The initial opening bid at the Auction is the Purchase Price set forth in the APA (the "Initial Opening Bid"). To be selected as an alternative transaction, a competing bid to purchase all the Free and Clear Assets must be for a purchase price at least $80,000 higher than the Initial Opening Bid and be submitted by a Qualified Bidder (as subsequently defined). Thereafter, any incremental bids to purchase all the Free and Clear Assets must exceed the previous bid by at least $50,000. The Debtor may also consider Qualified Bidder competing bids to purchase some, but not all, of the Free and Clear Assets; provided, however, that, to be selected as an alternative transaction, the highest and best competing bids to purchase portions of the Free and Clear Assets must have be for cumulative purchase prices totaling at least $50,000 higher than the Initial Opening Bid.

b. For a bid to be considered, it must be submitted by a "Qualified Bidder." A Qualified Bidder is one who has complied with the terms and conditions set forth herein, the Bid Notice and such other terms and conditions that the Court may order, and has demonstrated the ability to close the transaction. In order to qualify as a Qualified Bidder, a bidder must submit a bid that:

(i) Fully discloses the bidder and the identity of the entity(ies), if any, which shall be directly or indirectly acquiring a portion of the Free and Clear Assets under or in connection with the bid;

(ii) Provides sufficient information regarding both the bidder and the partner(s), if any, to satisfy Debtor with respect to the requirements enumerated in § 363(n) of the Bankruptcy Code;

(iii) States with specificity the assets to be acquired and the liabilities the bidder intends to assume;

(iv) Is accompanied by a deposit of cash in the amount of (a) $50,000 if the competing bid contemplates the purchase all or substantially all of the Free and Clear Assets; or (b) fifteen percent (15%) of the cash purchase price set forth in the competing bid if the bid contemplates the purchase of less than substantially all of the Free and Clear Assets (in either event, a "Deposit"). The Deposit shall be by wire transfer to the account of Rumberger Kirk, P.A., pursuant to instructions to be provided upon request. The Deposit shall be held by the Escrow Agent in an interest bearing escrow account pursuant to terms and provisions of the APA. The Deposit shall be returned to any Bidder whose bid is not accepted by Debtor within three (3) business days following the closing of the sale. The Deposit of the Successful Bidder, together with any interest earned thereon, shall be treated in accordance with the APA;

(v) Such bid is accompanied by proof of financial ability to consummate the sale; and

(vi) Such bid must be submitted to the Debtor by sending the same to Rumberger Kirk, P.A. 2001 Park Place Suite 1300 Birmingham, AL 35203 at least three (3) business days prior to the Auction date.

Any party wishing to submit a bid for the Free and Clear Assets who fails to qualify as a Qualify Bidder at least three (3) business days prior to the Auction shall be barred from bidding on the Free and Clear Assets of the Debtor at the Auction. The Debtor retains the right to determine whether a bidder has sufficiently qualified as a Qualified Bidder.

c. At the Auction, the second highest or otherwise best bid (or bids, in the case that the Debtor accepts bids to sell the Free and Clear Assets in multiple transactions), as determined by Debtor in its discretion (whether one or more, the "Next Best Bid"), submitted at the Auction shall remain open and irrevocable for a period of ten (10) days following the entry of the Sale Order; provided, however, that notwithstanding the foregoing, if the Next Best Bid is made by Purchaser, any sale transaction resulting therefrom shall be consummated in accordance with the terms and provisions, and at the purchase price, set forth in the APA.

d. The Debtor retains the right to exercise its business judgment to determine which bid constitutes the highest or otherwise best bid. Acceptance of the highest or otherwise best bid shall, in all respects, be subject to entry of an order by the Bankruptcy Court which, among other things, authorizes Debtor to consummate the sale of assets to the successful bidder (whether one or more Qualified Bidders, the "Successful Bidder").

e. All Qualified Bidders must be prepared to enter in an asset purchase agreement which is, other than the stated purchase price and the Free and Clear Assets to be purchased in substantially the same form as the APA. Any Qualified Bidder must submit with their bid a "marked-up" copy of the APA reflecting the changes the Qualified Bidder would require).

f. Notice of the Sale.

(i) The Notice of Sale shall provide instructions to counterparties to executory contracts and unexpired leases for obtaining a schedule of those executory contracts and unexpired leases that might be assumed by a buyer of the Free and Clear Assets (the “Assumed Contracts”) and the cure amounts, if any, under the Assumed Contracts. Prior to serving the Notice of Sale, the Debtor shall file a schedule of the Assumed Contracts (the “Cure Schedule”) – including the proposed cure amounts, if any, under the Assumed Contracts (the “Cure Amounts”) – with the Court. The Notice of Sale

provides notice to all counterparties to the Assumed Contracts of: (i) the Debtor's proposed assumption of some or all of the Assumed Contracts and assignment of such Assumed Contracts to a buyer of the Free and Clear Assets and (ii) the availability of the Cure Schedule upon written request to counsel for the Debtor.

(ii) Any objection on any basis that any party has to the Motion or to the assumption and assignment of any executory contracts or unexpired leases to which the Debtor is a party must be in writing and must be filed with the Court no later than 5:00 p.m. Central Standard Time on the date that is two (2) business days prior to the date of the Sale Hearing (the "Objection Deadline"), and served on the Debtor's counsel, so as to be received by no later than the Objection Deadline. An objection shall be in writing and set forth with particularity the grounds for such objection or other statements of position and otherwise comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of the Court. If a counterparty to any Assumed Contract fails to timely object to the Motion, in accordance with the deadlines and requirements set forth herein, the counterparty will be forever barred from disputing the Cure Amounts or otherwise asserting any other cure amounts with respect to the Assumed Contracts or from otherwise objecting to the assumption and assignment of the Assumed Contracts.

g. At the election of the Debtor, the Auction may be held at the offices of Rumberger Kirk, P.A. 2001 Park Place Suite 1300, Birmingham, Alabama 35203 or such other location as Debtor demies appropriate by the Debtor in its discretion. At such Auction, the Debtor may sequester Qualified Bidders in separate rooms and meet and negotiate individually with each Qualified Bidder to obtain the highest and best offer for the Free and Clear Assets from such Qualified Bidders. In such event, however, the Debtor shall periodically convene a meeting of all participating Qualified Bidders to discuss the status of the bids, and the Auction shall not be terminated until all participating Qualified Bidders have been advised of the highest or otherwise best bid and given an opportunity to make a higher or otherwise better bid. All bidding for the Free and Clear Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in

connection with any disputes relating to the Auction, the sale of the Assets, and the construction and enforcement of any bids submitted before, during, or after the Auction."

**B. Bidding Protections**

14. Debtor has determined that the Initial Opening Bid represents the highest or otherwise best offer received to date for the purchase of the Free and Clear Assets. Nevertheless, the Debtor cannot provide Purchaser with absolute assurance that it will not be exposed to further competitive bidding from Qualified Bidders (a "Competing Bid").

## IV. THE SALE

15. The Debtor requests that the Court, for the benefit of the Debtor's estate, waive any and all transfer taxes, recordation fees, or similar amounts as part of the sale.

16. Completion of the Proposed Sale will be subject to the contingencies set forth in the APA.

## V. APPLICABLE STANDARDS

**A. Business Judgment**

17. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor-in-possession is given these rights by § 1107(a) of the Bankruptcy Code. See 11 U.S.C. § 1107(a). Moreover, § 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105(a).

18. To approve a use, sale, or lease of property other than in the ordinary course of business, the court must find some business justification.

19. Debtor believes its consideration of the Proposed Sale and its conducting the Auction as described herein will achieve the highest benefit to the estate. Accordingly, the sale of the Free and Clear Assets as set forth herein is in the best interest of Debtor's chapter 11 estate and creditors. The Debtor believes that value added to the estate will be maximized if the Proposed Sale closes as soon as possible.

**B. Sale Free and Clear of Liens**

20. Section 363(f) of the Bankruptcy Code permits the Debtor to sell the estate's assets free and clear of all liens, claims, charges, encumbrances, or interests which may be asserted, with any such liens, claims, charges, encumbrances, or interests attaching to the proceeds of the sale, in the same order and priority in which they attached to the Free and Clear Assets subject to the rights and defenses of the Debtor with respect thereto. Accordingly, the Debtor seeks approval for the Free and Clear Assets to be sold, conveyed, transferred, and delivered to Purchaser, free and clear of all liens, leases, encumbrances, and interests of any kind.

21. Debtor submits that the Proposed Sale complies with the provisions of §363(f) of the Bankruptcy Code. The Proposed Sale is in the best interest of the estate and creditors.

**C. Good Faith Purchaser**

22. Purchaser is buying the Free and Clear Assets in good faith in accordance with § 363 of the Bankruptcy Code.

23. Debtor is unaware of any indication of fraud or collusion with other potential bidders or the existence of an unfair advantage to Purchaser.

24. The terms of the sale were negotiated at arms' length, which each party represented by independent and experienced attorneys of its own choosing.

25. Debtor believes that Purchaser is a good faith purchaser and will proceed in good faith in all respects in connection with this proceeding and the sale of the Free and Clear Assets. Thus, the sale is subject to a finding by the Court under § 363(m) of the Bankruptcy Code that Purchaser is a good faith purchaser of the Free and Clear Assets. Although the Bankruptcy Code does not define "good faith purchaser," the phrase encompasses one who purchases in "good faith" and for "value."

26. Debtor respectfully submits that Purchaser's offer to purchase the Free and Clear Assets, though subject to higher and better offers, is the best offer for the Free and Clear Assets.

27. Debtor further submits that the Proposed Sale, coupled with the Bidding Procedures, will maximize the value obtained for the Free and Clear Assets and that the closing of the Proposed Sale should occur promptly after the Sale Hearing.

28. Accordingly, the Proposed Sale to Purchaser would be in "good faith" within the meaning of the Bankruptcy Code.

**D. <u>Time is of the Essence</u>**

29. The Debtor needs to consummate a sale as soon as possible in order to are several ongoing operations.

**E. <u>Sale Notice</u>**

30. The Debtor intends to serve this Motion upon (i) the Bankruptcy Administrator for the United States Bankruptcy Court for the Northern District of Alabama, Southern Division; (ii) counsel to the Debtor; (iii) counsel to the Purchaser; (iv) counsel and all known parties holding liens, leaseholds, or other interests in the Assets; (v) all known parties that have heretofore expressed an interest in purchasing some or all of the Assets or who Debtor otherwise believes may have an interest in a potential transaction; (vi) counterparties to the Assumed Contracts; and (vii) all parties that have filed notices of appearance. The Debtor also intends to file the Sale Notice, upon the parties described above and all other parties required to be served pursuant to the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

31. The Debtor proposes that any party with an objection to this Motion or the Proposed Sale shall submit said objections to the Debtor and the Court on or before the Objection Deadline.

## VI. <u>RELIEF REQUESTED</u>

**WHEREFORE**, Debtor moves this Court enter Orders:

A. Scheduling an expedited hearing to approve Bidding Procedures;

B. Authorizing and approving the Bidding Procedures, including but not limited to the date for qualification of bidders and the Objection Deadline;

C. Scheduling an Auction for the sale of the Free and Clear Assets for a date that is not more than thirty (30) days following entry of the order authorizing and approving the Bidding Procedures;

D. Authorizing and approving the notice procedures set forth herein, including, without limitation, the form and substance of the Sale Notice;

E. Should this Court approve and confirm the sale of the Free and Clear Assets pursuant to the Proposed Sale or an Alternative Proposal, to authorize the Debtor, pursuant to Bankruptcy Rule 6004(f)(2), to execute any instrument necessary or appropriate, or as ordered by the Court, to consummate the Proposed Sale or Alternative Proposal resulting in a transfer the Assets to the buyer; and

F. To order that any liens, claims, charges, encumbrances, or interests of any parties in and to the Free and Clear Assets attach to the proceeds received by the Debtor from the sale of the Free and Clear Assets to the same extent and in the same priority they respectively have against the Free and Clear Assets; and

G. Should this Court approve and confirm the sale of the Free and Clear Assets pursuant to the APA or such other bid, to order the Escrow Agent to retain the proceeds from such sale in a financial institution pending a determination by the Court as to the party or parties entitled to a distribution of such proceeds and the amount of such proceeds to which each such party is entitled; and

H. To order the ten-day stay provided by Federal Rule of Bankruptcy Procedure, Rules 6004(g) and 6006(d) be expressly waived in any order approving this Motion, the Proposed Sale or an Alternative Proposal, time being of the essence; and

I. Approving the Debtor's assumption and assignment of the Assumed Contracts pursuant to § 365 of the Bankruptcy Code; and

J. Granting such other and further relief as the Court deems appropriate.

**RESPECTFULLY SUBMITTED** this _____day of November, 2026.

*/s/ R. Scott Williams*
R. Scott Williams

Of Counsel:
RUMBERGER, KIRK, & CALDWELL, P.C.
Renasant Place
2001 Park Place, Suite 1300
Birmingham, Alabama 35203
Telephone: 205.327.5550
Fax: 205.326.6786
Email: swilliams@rumberger.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion was served upon the Bankruptcy Administrator and upon all creditors and interested parties in the attached Matrix by placing a copy of the same the United States Mail, first class postage prepaid and properly addressed this, 2nd day of November 2026.

/s/R. Scott Williams
R. Scott Williams

# Exhibit A

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



# ASSET PURCHASE AGREEMENT

**by and between**

**GASPOS, INC.,**

A Delaware corporation, as Debtor and Debtor-in-Possession,
Case No. 26-00362-DSC-11
United States Bankruptcy Court,
Northern District of Alabama, Birmingham Division

**and**

**BZ MART LLC,**

a Delaware corporation,
as Purchaser

Dated as of – October 30, 2026

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



## TABLE OF CONTENTS


| | | |
|---|---|---|
| **ARTICLE I** | — DEFINITIONS | 3 |
| **ARTICLE II** | — PURCHASE AND SALE OF ASSETS | 8 |
| **ARTICLE III** | — PURCHASE PRICE AND PAYMENT | 11 |
| **ARTICLE IV** | — BANKRUPTCY COURT MATTERS | 13 |
| **ARTICLE V** | — REPRESENTATIONS AND WARRANTIES OF SELLER | 16 |
| **ARTICLE VI** | — REPRESENTATIONS AND WARRANTIES OF PURCHASER | 20 |
| **ARTICLE VII** | — COVENANTS | 21 |
| **ARTICLE VIII** | — CONDITIONS TO CLOSING | 25 |
| **ARTICLE IX** | — CLOSING | 27 |
| **ARTICLE X** | — TERMINATION | 29 |
| **ARTICLE XI** | — GENERAL PROVISIONS | 31 |
| **SCHEDULES AND EXHIBITS** | | 35 |

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***") is entered into as of October 28, 2026 (the "***Agreement Date***"), by and between GASPOS, INC., a Delaware corporation, as debtor and debtor-in-possession (the "***Seller***" or the "***Debtor***") in Case No. 26-00362-DSC-11 (the "***Bankruptcy Case***") pending before the United States Bankruptcy Court for the Northern District of Alabama, Birmingham Division (the "***Bankruptcy Court***"); and BZ MART, LLC, a Delaware corporation, or its permitted assignee or nominee designated pursuant to Section 11.7 hereof (the "***Purchaser***"). Seller and Purchaser are referred to herein individually as a "*Party*" and collectively as the "*Parties*."

## RECITALS

WHEREAS, on February 2, 2026 (the "***Petition Date***"), Seller filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court, and Seller continues to operate its business and manage its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the BANKRUPTCY CODE;

WHEREAS, Seller is engaged in the business of developing, marketing, licensing, and supporting point-of-sale software and payment processing solutions for the petroleum retail industry (the "***Business***");

WHEREAS, Purchaser desires to purchase substantially all of the assets of Seller used in or related to the Business, and Seller desires to sell, transfer, assign, and convey such assets to Purchaser, in each case on the terms and subject to the conditions set forth herein, and subject to the approval of the Bankruptcy Court pursuant to, inter alia, sections 363 and 365 of the BANKRUPTCY CODE;

WHEREAS, the Parties intend that the sale of the Purchased Assets shall be free and clear of all Liens, Claims, and Interests (as defined herein) to the fullest extent permitted by applicable law, including section 363(f) of the BANKRUPTCY CODE;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations, and warranties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1.** ***Definitions.*** As used in this Agreement, the following terms shall have the meanings set forth below:

"***Alternative Transaction***" means any sale, transfer, license, merger, recapitalization, plan of reorganization, or other disposition of all or any material portion of the Purchased Assets or the Business to any Person other than Purchaser.

"***Assumed Contracts***" means the executory contracts and unexpired leases of Seller listed on Schedule 2.1(c), as such schedule may be amended by Purchaser prior to Closing in accordance with Section 3.3(b).

"***Assumed Liabilities***" has the meaning set forth in Section 2.3.

"***Bankruptcy Code***" means title 11 of the UNITED STATES CODE, 11 U.S.C. §§ 101 et seq., as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Alabama, Birmingham Division over the Bankruptcy Case, or any other court having jurisdiction over the Bankruptcy Case or any appeal therefrom.

"***Bid Procedures***" means the bidding procedures for the Sale Process approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"***Bid Procedures Order***" means the order of the Bankruptcy Court, in form and substance satisfactory to Purchaser in its reasonable discretion, approving the Bid Procedures.

"***Business***" means the business of developing, marketing, licensing, distributing, and supporting point-of-sale software and payment processing solutions for the petroleum retail industry as conducted by Seller as of the date of this Agreement.

"***Business Day***" means any day other than a Saturday, Sunday, or a day on which commercial banks in the State of Texas are authorized or required to be closed.

"***Closing***" means the consummation of the transactions contemplated by this Agreement in accordance with Article IX.

"***Closing Date***" means the date on which the Closing occurs, as determined in accordance with Section 9.1.

"***Confidential Information***" means all non-public, proprietary, or confidential information of a Party, including trade secrets, customer lists, financial information, technical data, know-how, and business strategies, whether disclosed orally, in writing, or in any other form.

"***Cure Costs***" means all amounts required to cure any defaults under the Assumed Contracts pursuant to section 365(b) of the BANKRUPTCY CODE as a condition to the assumption and assignment thereof to Purchaser.

"***Cure Cost Cap***" means the aggregate maximum amount of Cure Costs that Purchaser is obligated to pay, which shall not exceed Fifty Thousand and 00/100 Dollars ($50,000.00) in the aggregate, as further described in Section 3.3.

"***Diligence Termination Date***" means the date that is 14 days following the Agreement Date, by which Purchaser may terminate this Agreement pursuant to Section 10.1(j) for any reason or no reason, in its sole discretion.

"***Agreement Date***" has the meaning set forth in the preamble.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***Final Order***" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek review, rehearing, or certiorari has expired and no appeal, review, or certiorari proceeding is pending.

"***Governmental Authority***" means any federal, state, local, or foreign government or political subdivision, regulatory or administrative agency, court, tribunal, or arbitral body.

"***Intellectual Property***" means all intellectual property and proprietary rights of any kind or nature, including: (a) patents, patent applications, and patent disclosures; (b) trademarks, service marks, trade names, domain names, and all goodwill associated therewith; (c) copyrights and works of authorship; (d)

trade secrets, know-how, and confidential business information; (e) software, source code, object code, algorithms, and related documentation; and (f) all registrations, applications, and renewals for any of the foregoing.

"***Key Employees***" means the employees of Seller identified on Schedule 5.1(d), as may be updated by Purchaser prior to Closing.

"***Lien***" means any mortgage, pledge, lien, security interest, charge, claim, hypothecation, deed of trust, encumbrance, restriction, or other interest of any kind.

"***Material Adverse Effect***" means any event, circumstance, change, or effect that, individually or in the aggregate, has resulted in, or would reasonably be expected to result in: (a) a reduction in annualized recurring processing revenue of more than twenty percent (20%) from the revenue baseline set forth on Exhibit A; (b) a loss of customers representing more than twenty percent (20%) of total recurring processing revenue; (c) any single customer that represented less than 5% of total processing revenue increasing to more than five percent (5%) of total processing revenue due to customer defections; (d) a material impairment of the Seller's ability to operate the Business or convey the Purchased Assets in accordance with this Agreement; or (e) aggregate Cure Costs in excess of the Cure Cost Cap. Notwithstanding the foregoing, none of the following shall constitute or contribute to a Material Adverse Effect: (i) changes in general economic, financial market, or industry conditions; (ii) the filing or pendency of the Bankruptcy Case; (iii) the announcement of the execution of this Agreement or the transactions contemplated herein; or (iv) acts of God, natural disasters, or other force majeure events.

"***Outside Closing Date***" means the date that is ninety (90) calendar days following the Agreement Date, as may be extended by mutual written agreement of the Parties.

"***Payment Processing Agreements***" means the agreements between Seller and payment card networks, payment processors, independent sales organizations, member service providers, and other payment processing counterparties, including those set forth on Schedule 2.1(h).

"***Person***" means any individual, corporation, partnership, limited liability company, trust, estate, Governmental Authority, or other entity.

"***Purchase Price***" has the meaning set forth in Section 3.1.

"***Purchased Assets***" has the meaning set forth in Section 2.1.

"***Sale Order***" means an Order of the Bankruptcy Court, in form and substance satisfactory to Purchaser in its sole and absolute discretion, approving this Agreement and the transactions contemplated herein pursuant to sections 363 and 365 of the BANKRUPTCY CODE, including findings that: (a) Purchaser is a good faith purchaser within the meaning of section 363(m) of the BANKRUPTCY CODE; (b) the Purchased Assets are transferred free and clear of all Liens, Claims, and Interests pursuant to section 363(f) of the BANKRUPTCY CODE; and (c) the assumption and assignment of the Assumed Contracts is authorized pursuant to section 365 of the BANKRUPTCY CODE.

"***Sale Process***" means the court-supervised process for the sale of the Purchased Assets pursuant to the Bid Procedures Order.

"***Transfer Taxes***" means all sales, use, transfer, stamp, documentary, filing, and recording taxes and fees arising from or relating to the transfer of the Purchased Assets.

# ARTICLE II
# PURCHASE AND SALE OF ASSETS

**Section 2.1.** ***Purchase and Sale of Purchased Assets.*** Subject to the terms and conditions of this Agreement and the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, free and clear of all Liens, Claims, and Interests to the fullest extent permitted by section 363(f) of the BANKRUPTCY CODE, all of Seller's right, title, and interest in and to all assets, properties, and rights of Seller used in, related to, or necessary for the operation of the Business (collectively, the "***Purchased Assets***"), including without limitation the following:

(a) Software and Intellectual Property. All Intellectual Property owned by or licensed to Seller and used in or related to the Business, including all rights in and to: (i) the GasPos point-of-sale software platform and all versions, modules, and updates thereof; (ii) all software products owned by Seller, including products in development as of the Closing Date; (iii) all source code, object code, algorithms, databases, and related technical documentation; (iv) all trademarks, service marks, and trade names (including "GasPos" and all associated goodwill); (v) all patents and patent applications; (vi) all copyrights and works of authorship; (vii) all trade secrets and know-how; and (viii) all domain names and website registrations, including the URLs set forth on Schedule 2.1(a);

(b) Development Rights. The exclusive, worldwide, perpetual rights to develop, modify, enhance, maintain, market, sell, license, distribute, and install current and future releases of all software products included in the Purchased Assets;

(c) Assumed Contracts. All rights of Seller under the Assumed Contracts set forth on Schedule 2.1(c), including all customer agreements, SaaS and software licensing arrangements, supply contracts, and vendor agreements, subject to the payment of applicable Cure Costs as provided in Section 3.3;

(d) Physical Assets. All tangible personal property owned by Seller and used in the Business, including all computers, servers, hardware, networking equipment, office equipment, supplies, and inventory, as more particularly described on Schedule 2.1(d);

(e) Books and Records. All business books and records of Seller related to the Business and the Purchased Assets, including customer and supplier lists and databases, pricing schedules, sales records, marketing materials, operational documentation, technical manuals, and financial records related to the Business (excluding Seller's tax records and corporate formation documents, which shall remain with the estate);

(f) Governmental Licenses and Authorizations. All transferable certificates, licenses, permits, registrations, and authorizations issued by any Governmental Authority and used in the operation of the Business, to the extent assignable under applicable law;

(g) Tangible Financial Assets. To the extent agreed by the Parties in writing prior to Closing: work in progress (WIP); prepaid expenses attributable to post-Closing periods; security deposits under Assumed Contracts; and net fixed assets (net of accumulated depreciation, excluding capitalized development costs and intangible assets such as goodwill);

(h) Payment Processing Infrastructure. All of Seller's rights in and to: (i) Payment Processing Agreements listed on Schedule 2.1(h); (ii) merchant portfolios and merchant relationships; (iii) PCI DSS compliance certifications and documentation; and (iv) ISO/MSP

registrations and associated rights, in each case to the extent assignable with required third-party consents obtained prior to Closing;

(i) Insurance Proceeds. All insurance proceeds, claims, and causes of action relating to the Purchased Assets to the extent arising from events occurring before the Closing Date; and

(j) Goodwill. All goodwill of the Business associated with the Purchased Assets.

**Section 2.2.** ***Excluded Assets.*** Notwithstanding anything to the contrary in Section 2.1, the Purchased Assets shall not include, and Purchaser shall have no right, title, or interest in or to, any of the following assets (collectively, the "***Excluded Assets***"):

(a) all cash and cash equivalents not expressly included in the Purchased Assets pursuant to Section 2.1(g);

(b) all accounts receivable accruing prior to the Closing Date;

(c) all Tax refunds, Tax credits, and Tax attributes of Seller relating to any pre-Closing period;

(d) all employee benefit plans, welfare plans, pension plans, and retirement accounts maintained by Seller;

(e) all claims, causes of action, and avoidance actions of Seller's bankruptcy estate under Chapter 5 of the BANKRUPTCY CODE (including preference claims and fraudulent transfer claims);

(f) all corporate formation documents, equity records, minute books, and Tax records of Seller;

(g) any assets expressly listed on Schedule 2.2; and

**Section 2.3.** ***Assumed Liabilities.*** At the Closing, Purchaser shall assume and agree to pay, perform, and discharge, as and when due, only the following liabilities and obligations of Seller (collectively, the "***Assumed Liabilities***"):

(a) Cure Costs, subject to the Cure Cost Cap, as further provided in Section 3.3; and

(b) all liabilities and obligations arising under the Assumed Contracts that are attributable to periods on and after the Closing Date.

For the avoidance of doubt, the Assumed Liabilities do not include any liability or obligation not expressly set forth in this Section 2.3.

**Section 2.4.** ***Excluded Liabilities.*** Purchaser shall not assume, and shall have no obligation to pay, perform, or discharge, any liability or obligation of Seller other than the Assumed Liabilities (collectively, the "***Excluded Liabilities***"), including without limitation:

(a) the SouthPoint Loan (~$10,000,000) and all amounts due thereunder;

(b) all pre-petition accounts payable, trade payables, and accrued expenses;

(c) all Tax liabilities of Seller for any pre-Closing period;

(d) all liabilities relating to current or former employees of Seller, including wages, benefits, workers' compensation, WARN Act obligations, and ERISA liabilities, accrued prior to the Closing Date;

(e) all deferred revenue obligations;

(f) all DIP financing obligations;

(g) all pre-petition litigation claims and causes of action against Seller;

(h) all obligations under rejected executory contracts and unexpired leases; and

(i) any other liability not expressly assumed pursuant to Section 2.3.

The Parties intend that the Sale Order shall contain an express finding and declaration confirming the exclusion of all Excluded Liabilities from the Purchased Assets and the Assumed Liabilities.

## ARTICLE III
## PURCHASE PRICE AND PAYMENT

**Section 3.1.** ***Purchase Price.*** The aggregate purchase price for the Purchased Assets (the "***Purchase Price***") shall be One Million and 00/100 Dollars [US $1,000,000.00] (the "***Base Purchase Price***"). The Purchase Price shall be payable in accordance with Section 3.2.

**Section 3.2.** ***Payment of Purchase Price.*** At the Closing, Purchaser shall pay the Base Purchase Price by wire transfer of immediately available funds to an account designated in writing by Seller no later than three (3) Business Days prior to the Closing Date.

**Section 3.3.** ***Cure Costs.***

(a) Responsibility. Purchaser shall be responsible for the payment of Cure Costs associated with the Assumed Contracts, subject to the Cure Cost Cap. In no event shall Purchaser be obligated to pay Cure Costs in excess of the Cure Cost Cap in the aggregate.

(b) Identification. Seller shall, within 17 days following the Agreement Date, deliver to Purchaser a schedule identifying all executory contracts and unexpired leases, together with Seller's good-faith estimate of the applicable Cure Costs for each (the "***Cure Cost Schedule***"). Purchaser shall have the right, in its sole discretion, to: (i) accept any or all Assumed Contracts with their associated Cure Costs, provided that aggregate Cure Costs do not exceed the Cure Cost Cap; (ii) remove any contract from Schedule 2.1(c) to avoid Cure Cost obligations thereunder; or (iii) if aggregate Cure Costs exceed the Cure Cost Cap, elect to (A) adjust the Purchase Price downward by the amount of the excess, (B) remove contracts from Schedule 2.1(c) to bring aggregate Cure Costs within the Cure Cost Cap, or (C) terminate this Agreement pursuant to Section 10.1(e).

(c) Dispute. Any dispute regarding the amount of Cure Costs shall be resolved by the Bankruptcy Court pursuant to section 365 of the BANKRUPTCY CODE.

**Section 3.4.** ***Transfer Taxes.*** Purchaser shall bear any Transfer Taxes arising from the sale of the Purchased Assets. The Parties shall cooperate to minimize Transfer Taxes to the extent permitted by applicable law.

## ARTICLE IV
## BANKRUPTCY COURT MATTERS

**Section 4.1.** ***Bid Procedures Order.***

(a) Filing. Within 5 Business Days following the Agreement Date, Seller shall file a motion with the Bankruptcy Court seeking approval of the Bid Procedures and entry of the Bid

Procedures Order. Purchaser shall have the right to review and approve the form and substance of the Bid Procedures Order prior to filing, which approval shall not be unreasonably withheld, conditioned, or delayed.

(b) Contents. The Bid Procedures Order shall, establish procedures for the submission of competing bids, including minimum overbid requirements; set a hearing date for approval of the Sale Order; and contain such other provisions as are acceptable to Purchaser.

**Section 4.2. *Sale Order.***

(a) Filing. Seller shall file a motion for approval of the Sale Order promptly following the conclusion of the auction (if any) conducted pursuant to the Bid Procedures.

(b) Form. The Sale Order shall be in form and substance satisfactory to Purchaser in its sole and absolute discretion, and shall include findings and orders that: (i) Purchaser is a purchaser in good faith pursuant to section 363(m) of the BANKRUPTCY CODE, entitled to the protections thereof; (ii) the Purchased Assets are transferred free and clear of all Liens, Claims, and Interests pursuant to section 363(f); (iii) all Excluded Liabilities shall remain liabilities of Seller's estate and shall not be assumed by or imposed upon Purchaser; (iv) the SouthPoint Loan and all related Liens are extinguished with respect to the Purchased Assets; (v) the assumption and assignment of the Assumed Contracts is approved pursuant to section 365; and (vi) Purchaser shall have no successor liability for any Excluded Liabilities.

(c) Finality. Purchaser's obligation to consummate the Closing is conditioned upon the Sale Order being a Final Order unless Purchaser waives this condition in writing in its sole discretion.

**Section 4.3. *Cooperation.*** Each Party shall use commercially reasonable efforts to cooperate with the other in connection with all filings, hearings, and proceedings before the Bankruptcy Court relating to this Agreement, the Bid Procedures Order, and the Sale Order. Seller shall promptly notify Purchaser of any objection filed with respect to the Bid Procedures or the Sale Order and shall provide Purchaser with copies of all relevant court filings.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser, as of the Agreement Date and as of the Closing Date (except as otherwise specified), as follows. The Parties acknowledge that Seller is operating as a debtor-in-possession and that these representations are made to the best of Seller's knowledge and belief, subject to the limitations inherent in Seller's status and the ongoing Bankruptcy Case:

**Section 5.1. *Organization; Authority; Enforceability.***

(a) Seller is a corporation organized under the laws of the State of Delaware.

(b) Seller has all requisite corporate power and authority, subject to entry of the Sale Order, to execute and deliver this Agreement and to consummate the transactions contemplated herein.

(c) This Agreement constitutes the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the Sale Order and applicable bankruptcy law.

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



(d) The execution, delivery, and performance of this Agreement by Seller, subject to entry of the Bid Procedures Order and the Sale Order, does not violate any provision of Seller's organizational documents or any applicable law.

**Section 5.2. *Intellectual Property.*** Seller owns, or has the valid right to use, all Intellectual Property included in the Purchased Assets, free and clear of all Liens (other than Liens to be discharged pursuant to the Sale Order).

**Section 5.3. *Limitations.***

**EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE V, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS, THE BUSINESS, OR ANY OTHER MATTER, AND THE PURCHASED ASSETS ARE SOLD "AS IS, WHERE IS" WITH ALL FAULTS. SELLER EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.**

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**Section 6.1. *Organization and Authority.*** Purchaser is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware. Purchaser has all requisite corporation power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein.

**Section 6.2. *Authorization and Enforceability.*** This Agreement has been duly authorized, executed, and delivered by Purchaser and constitutes the legal, valid, and binding obligation of Purchaser, enforceable in accordance with its terms. The execution, delivery, and performance of this Agreement by Purchaser does not violate any provision of Purchaser's organizational documents or any applicable law.

**Section 6.3. *Financial Capability.*** Purchaser has, or will have as of the Closing Date, sufficient immediately available funds to pay the Purchase Price and all fees and expenses payable by Purchaser in connection with the transactions contemplated herein. Purchaser's obligations under this Agreement are not subject to any financing condition.

**Section 6.4. *Good Faith.*** Purchaser is acquiring the Purchased Assets in good faith within the meaning of section 363(m) of the BANKRUPTCY CODE and is entitled to the protections afforded thereby. Purchaser has not engaged in any conduct that would cause or permit the Sale Order to be avoided under applicable law.

**Section 6.5. *Independent Investigation.*** Purchaser has conducted its own independent investigation of the Business and the Purchased Assets and is not relying on any representation or warranty of Seller not expressly set forth in this Agreement.

## ARTICLE VII
## COVENANTS

**Section 7.1. *Conduct of Business Prior to Closing.*** From the Agreement Date through the Closing Date, Seller shall, except as otherwise required by applicable bankruptcy law or court order, or as consented to by Purchaser in writing:

(a) operate the Business in the ordinary course, consistent with past practice;

(b) use commercially reasonable efforts to preserve the Business, the Purchased Assets, and the goodwill of customers, suppliers, and employees;

(c) maintain the Purchased Assets in their current condition, ordinary wear and tear excepted;

(d) not transfer, sell, lease, license, or otherwise dispose of any Purchased Assets outside the ordinary course of business without Purchaser's prior written consent;

(e) not enter into, materially amend, or terminate any material contract included in the Purchased Assets without Purchaser's prior written consent;

(f) not incur any new indebtedness or material obligations that would constitute Assumed Liabilities without Purchaser's prior written consent; and

(g) promptly notify Purchaser of any event, occurrence, or condition that would reasonably be expected to result in a Material Adverse Effect.

**Section 7.2.** ***Access and Due Diligence.*** From the Agreement Date through the Closing Date, Seller shall afford Purchaser and its representatives reasonable access during normal business hours to: (a) Seller's properties, books, records, contracts, and personnel; (b) a full virtual data room containing all items described in Section 7.2 of the LOI; and (c) management of Seller for presentations and inquiry sessions. Purchaser shall conduct all due diligence in a manner that does not unreasonably disrupt Seller's business operations.

**Section 7.3.** ***Notification Obligations.*** Each Party shall promptly notify the other in writing of: (a) any fact, event, or condition that would reasonably be expected to cause any representation or warranty of such Party to be untrue or inaccurate in any material respect; (b) any failure to comply with or satisfy any covenant, condition, or agreement required to be complied with or satisfied hereunder; and (c) any legal proceeding commenced against such Party relating to the transactions contemplated herein.

**Section 7.4.** ***Further Assurances.*** Each Party shall execute and deliver such additional documents, instruments, and agreements, and shall take such further actions, as may be reasonably necessary or appropriate to conduct the purposes and intent of this Agreement and to consummate the transactions contemplated herein.

**Section 7.5.** ***Payment Processing Consents.***

(a) Following the Agreement Date, Seller and Purchaser shall each use commercially reasonable efforts to obtain all required third-party consents to the assignment of the Payment Processing Agreements to Purchaser, including consents from payment card networks, payment processors, and ISO/MSP counterparties.

(b) The failure to obtain consent for the assignment of any Payment Processing Agreement representing less than ten percent (10%) of total annualized processing revenue (as measured by the Revenue Baseline) shall not constitute a failure of a condition to Closing and shall not give Purchaser a right to terminate this Agreement.

(c) In the event that consents for Payment Processing Agreements representing more than twenty-five percent (25%) of total annualized processing revenue cannot be obtained prior to Closing after commercially reasonable efforts, Purchaser shall have the right to: (i) terminate this

Agreement pursuant to Section 10.1(d); or (ii) proceed with Closing at a reduced Purchase Price to be agreed in writing by the Parties.

(d) Seller shall not take any action, or omit to take any action, which would reasonably be expected to jeopardize any Payment Processing Agreement or any consent required thereunder.

(e) The Parties acknowledge that continuity of the payment processing services provided under Seller's agreement with Comdata Inc. (the "Comdata Agreement") is material to the value of the Purchased Assets. The Comdata Agreement is a Payment Processing Agreement and shall be set forth on Schedule 2.1(h). Seller shall use commercially reasonable efforts to obtain, prior to Closing, all consents necessary to assume and assign the Comdata Agreement to Purchaser, and the Parties shall cooperate to effect the transfer of the Comdata Agreement, together with the associated merchant relationships and processing arrangements, to Purchaser at the Closing so that payment processing operations continue without interruption following the Closing.

**Section 7.6.** ***Key Employee Transition.*** Prior to the Closing, Purchaser and Seller shall negotiate in good faith and use commercially reasonable efforts to enter into a separate written agreement (the "Key Employee Agreement") providing for the orderly transition and continued availability to Purchaser, on and after the Closing Date, of the individuals identified on Schedule 5.1(d). The Parties acknowledge that Seller's existing arrangements with such individuals are personal to Seller and are not being assigned to or assumed by Purchaser, and that Seller does not, and cannot, guarantee the continued employment, availability, or performance of any such individual. Execution of the Key Employee Agreement shall not be a condition to either Party's obligation to consummate the Closing unless the Parties expressly so provide therein.

**Section 7.7.** ***Confidentiality.*** Each Party shall maintain in confidence all Confidential Information of the other Party disclosed in connection with this Agreement. Neither Party shall disclose any Confidential Information to any third party without the prior written consent of the other Party, except: (a) to such Party's advisors, employees, and representatives who have a need to know such information and are bound by confidentiality obligations no less restrictive than those set forth herein; (b) as required by applicable law, regulation, or court order (including filings in the Bankruptcy Case); or (c) as necessary to consummate the transactions contemplated herein. The confidentiality obligations of this Section 7.7 shall survive the termination or expiration of this Agreement for a period of twenty-four (24) months.

**Section 7.8.** ***Bankruptcy Filings.*** Seller shall promptly provide Purchaser with copies of all material pleadings, motions, orders, and other documents filed in the Bankruptcy Case that relate to the transactions contemplated herein or that could reasonably affect the Purchased Assets, the Assumed Contracts, or the Sale Process.

## ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.1.** ***Mutual Conditions.*** The obligations of each Party to consummate the Closing are subject to the satisfaction (or waiver in writing by both Parties) of each of the following conditions:

(a) the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order (unless waived in writing by Purchaser in its sole discretion);

(b) no Governmental Authority shall have enacted any law or issued any order, injunction, or decree that would prohibit or make illegal the consummation of the transactions contemplated herein; and

(c) all required approvals of the Bankruptcy Court for the transactions contemplated herein shall have been obtained.

**Section 8.2.** ***Conditions to Purchaser's Obligations.*** The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver in writing by Purchaser) of each of the following conditions:

(a) the representations and warranties of Seller set forth in Article V shall be true and correct in all material respects as of the Agreement Date and as of the Closing Date as if made on and as of such date;

(b) Seller shall have performed and complied in all material respects with all covenants and obligations required to be performed or complied with by Seller pursuant to this Agreement at or prior to the Closing;

(c) no Material Adverse Effect shall have occurred since the Agreement Date;

(d) the Sale Order shall have been entered and shall be a Final Order, in form and substance satisfactory to Purchaser in its sole and absolute discretion;

(e) aggregate Cure Costs shall not exceed the Cure Cost Cap, unless Purchaser has agreed in writing to a higher amount;

(f) Seller shall have delivered to Purchaser all closing deliveries required pursuant to Section 9.2; and

**Section 8.3.** ***Conditions to Seller's Obligations.*** The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver in writing by Seller) of each of the following conditions:

(a) the representations and warranties of Purchaser set forth in Article VI shall be true and correct in all material respects as of the Agreement Date and as of the Closing Date;

(b) Purchaser shall have performed and complied in all material respects with all covenants and obligations required to be performed or complied with by Purchaser prior to the Closing;

(c) the Sale Order shall have been entered and shall be a Final Order; and

(d) Purchaser shall have delivered to Seller all closing deliveries required pursuant to Section 9.3.

## ARTICLE IX
## CLOSING

**Section 9.1.** ***Closing Date.*** The Closing shall take place remotely by exchange of electronic documents and signatures on the date that is five (5) Business Days following the satisfaction or waiver of all conditions to Closing set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing), or such other date as the Parties may agree in writing. In no event shall the Closing occur later than the Outside Closing Date.

**Section 9.2.** ***Seller's Closing Deliveries.*** At or prior to the Closing, Seller shall deliver to Purchaser:

(a) a bill of sale, assignment, and assumption agreement, in form and substance satisfactory to Purchaser, transferring and conveying all Purchased Assets to Purchaser and effecting the assumption of the Assumed Liabilities by Purchaser;

(b) an assignment of all Intellectual Property included in the Purchased Assets, in recordable form;

(c) executed counterparts of all assignment and assumption agreements for the Assumed Contracts;

(d) a copy of the Sale Order, certified by the clerk of the Bankruptcy Court;

(e) a certificate of an authorized officer of Seller confirming that the conditions set forth in Section 9.3 have been satisfied;

(f) all business records, files, and documentation comprising the Purchased Assets;

(g) access credentials, passwords, and security tokens for all software, systems, and domains included in the Purchased Assets; and

(h) all other documents, instruments, and agreements reasonably required to consummate the transactions contemplated herein.

**Section 9.3.** ***Purchaser's Closing Deliveries.*** At or prior to the Closing, Purchaser shall deliver to Seller:

(a) payment of the Purchase Price by wire transfer of immediately available funds;

(b) executed counterparts of the bill of sale, assignment, and assumption agreement;

(c) a certificate of an authorized officer of Purchaser confirming that the conditions set forth in Section 9.2 have been satisfied; and

(d) all other documents, instruments, and agreements reasonably required to consummate the transactions contemplated herein.

**Section 9.4.** ***Transition Assistance.*** For a period of 30 days following the Closing Date, Seller's estate shall, to the extent feasible and subject to the availability of Seller's personnel and the Bankruptcy Court's approval, cooperate with Purchaser to facilitate an orderly transition of the Business and the Purchased Assets, including by making former employees (if any remain) reasonably available to assist with knowledge transfer, and by providing Purchaser with access to any books and records not transferred at Closing. Purchaser shall reimburse Seller's estate for any reasonable out-of-pocket costs incurred in connection with such transition assistance.

## ARTICLE X
## TERMINATION

**Section 10.1.** ***Termination Rights.*** This Agreement may be terminated prior to the Closing as follows:

(a) by mutual written consent of Purchaser and Seller;

(b) by either Party, if the Closing has not occurred by the Outside Closing Date, provided that the Party seeking termination is not then in material breach of this Agreement;

(c) by Purchaser, if the Bankruptcy Case is converted to a case under Chapter 7 of the BANKRUPTCY CODE, or if a trustee is appointed in the Bankruptcy Case, and such conversion or appointment is not reversed within 10 Business Days;

(d) by Purchaser, if the payment processing consents contemplated by Section 7.5 has not been satisfied or waived by the date that is 45 days prior to the Outside Closing Date after the Parties' commercially reasonable efforts to obtain such consents;

(e) by Purchaser, if aggregate Cure Costs exceed the Cure Cost Cap and Purchaser elects not to proceed pursuant to Section 3.3(b);

(f) by Purchaser, if a Material Adverse Effect has occurred and is continuing and has not been cured within 15 Business Days of written notice by Purchaser;

(g) by Purchaser, if the Bankruptcy Court has not entered the Bid Procedures Order within 45 days following the Agreement Date;

(h) by Purchaser, if the Bankruptcy Court has not entered the Sale Order within 75 days following the entry of the Bid Procedures Order; or

(i) by Seller, if Purchaser is in material breach of this Agreement and such breach has not been cured within 10 Business Days of written notice; or

(j) by Purchaser, for any reason or no reason, in its sole discretion, by written notice to Seller delivered on or before the Diligence Termination Date.

**Section 10.2.** ***Effect of Termination.*** Upon termination of this Agreement pursuant to Section 10.1, all obligations of the Parties hereunder shall terminate and be of no further force or effect, and neither Party shall have any liability to the other arising out of or relating to this Agreement, except that: (a) the provisions of Section 7.7 (Confidentiality) and Article XI (General Provisions) shall survive termination; and (b) termination shall not relieve any Party of liability for any material breach of this Agreement prior to termination.

## ARTICLE XI
## GENERAL PROVISIONS

**Section 11.1.** ***Governing Law.*** This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, without regard to any choice-of-law or conflict-of-law rules that would require the application of the laws of any other jurisdiction. All matters relating to the Bankruptcy Case, the Sale Order, or the Bid Procedures Order, and the interpretation or enforcement of this Agreement in the context of the Bankruptcy Case, shall be governed by applicable federal bankruptcy law and the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Alabama, Birmingham Division.

**Section 11.2.** ***Dispute Resolution.***

(a) Jurisdiction. Each Party irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court for all disputes arising out of or relating to this Agreement, the Sale Order, or the transactions contemplated herein during the pendency of the Bankruptcy Case. Following the closure of the Bankruptcy Case, disputes shall be resolved exclusively in the United States District Court for the Northern District of Alabama or, if federal jurisdiction is unavailable, the state courts of Jefferson County, Alabama, and each Party hereby irrevocably submits to the personal jurisdiction of such courts and waives any objection to venue therein.

(b) Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN.

**Section 11.3.** ***Entire Agreement.*** This Agreement (together with the Schedules and Exhibits attached hereto) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions of the Parties, whether oral or written. No prior drafts of this Agreement shall be used in the interpretation of this Agreement.

**Section 11.4.** ***Amendments and Waivers.*** This Agreement may not be amended, modified, or supplemented except by a written instrument signed by both Parties. No waiver of any provision of this Agreement shall be effective unless made in writing and signed by the waiving Party. No failure or delay by any Party in exercising any right hereunder shall operate as a waiver thereof.

**Section 11.5.** ***Notices.*** All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed duly given: (a) when delivered personally; (b) one Business Day after being sent by nationally recognized overnight courier with written confirmation of receipt; (c) when transmitted by email with confirmation of receipt by the recipient (provided a copy is sent by overnight courier); or (d) three Business Days after being mailed by certified or registered mail, return receipt requested. Notices shall be addressed as follows:

If to Purchaser:

BZ Mart, LLC, a Delaware corporation
Attn: Mallik Panda
2222 S. Service Drive, S100
Dallas, Texas 75261
MAILING ADDRESS
2420 Innovation Drive, Box 610485
Dallas, Texas 75261-0485
Email: *mallik@iteaminc.com*

With a copy to:

Fred Hull, Legal Counsel
MAILING ADDRESS
2420 Innovation Drive, Box 610053
Dallas, Texas 75261-0053
Email: *hull.esq@pm.me*

If to Seller:

GasPos, Inc., Debtor-in-Possession
Attn: Joshua Smith
419 Main St, Suite 200
North Little Rock, Arkansas 72114

With a copy to:

R. Scott Williams, Legal Counsel
Email: *swilliams@rumberger.com*
MAILING ADDRESS
2001 Park Place Suite 1300

Birmingham, AL 35203

**Section 11.6.** ***Severability.*** If any provision of this Agreement is held invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision hereof or the validity or enforceability of such provision in any other jurisdiction.

**Section 11.7.** ***Assignment; Nominee.***

(a) Purchaser may, upon written notice to Seller at least five (5) Business Days prior to Closing, designate a wholly owned subsidiary, affiliate, or special purpose entity (a "***Nominee***") to take title to all or any portion of the Purchased Assets at Closing, provided that: (i) Purchaser shall remain jointly and severally liable for all obligations of the Nominee hereunder; and (ii) such designation shall not delay or otherwise adversely affect the Closing.

(b) Except as set forth in Section 11.7(a), neither Party may assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.

**Section 11.8.** ***No Third-Party Beneficiaries.*** This Agreement is for the sole and exclusive benefit of the Parties and their respective permitted successors and assigns. Nothing in this Agreement shall create or give to any third party any legal or equitable right, remedy, or claim.

**Section 11.9.** ***Counterparts; Electronic Signatures.*** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Electronic signatures (including PDF) shall be deemed original signatures for all purposes.

**Section 11.10.** ***Construction.*** This Agreement shall be construed without regard to any presumption or rule requiring construction against the Party causing this Agreement to be drafted. The headings of the Articles and Sections are for convenience only and shall not affect the interpretation of this Agreement.

***[ The Signature Block Begins on the Next Page ]***

IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the date first written above.

**GASPOS, INC.,**
a Delaware corporation, as Debtor and Debtor-in-Possession

By: ______________________________
Name: Joshua Smith
Title: Chief Executive Officer
Date: 10/28/2026

**BZ MART LLC,**
a Delaware corporation

By: Signed by: CC3922E9FCD9415...
Name: Mallik Panda
Title: Authorized Signatory
Date: 10/30/2026

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



## SCHEDULES AND EXHIBITS

**Schedule 2.1(a)**

Registered Intellectual Property and Domain Names

To be completed during due diligence. Include all registered trademarks, patents, copyrights, and domain name registrations owned by GasPos, Inc. as of the Closing Date.

## SCHEDULES AND EXHIBITS

**Schedule 2.1(d)**

Physical Assets

To be completed during due diligence. Include all computers, servers, hardware, networking equipment, and tangible personal property used in the Business.

## SCHEDULES AND EXHIBITS

**Schedule 2.1(h)**
Payment Processing Agreements

To be completed during due diligence. Include all agreements with payment card networks (Visa, Mastercard, Discover), payment processors, ISOs, and MSPs. Identify which agreements require third-party consent to assignment. The agreement with Comdata Inc. (the "Comdata Agreement") shall be included as a Payment Processing Agreement and assigned to Purchaser at Closing for continuity of payment processing operations.

## SCHEDULES AND EXHIBITS

**Schedule 2.1(c)**
Assumed Contracts

To be completed and finalized by Purchaser no later than 10 Business Days prior to the Closing Date. Purchaser reserves the right to add or remove contracts from this Schedule in accordance with Section 3.3(b) through the date that is 5 Business Days prior to Closing.

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



## SCHEDULES AND EXHIBITS

**Schedule 2.2**
Excluded Assets (Supplemental)

To be completed during due diligence if additional specific assets are to be excluded from the Purchased Assets beyond those described in Section 2.2 of the Agreement.



Case 26-00362-DSC11 Doc 83 Filed 11/02/26 Entered 11/02/26 14:10:06 Desc Main Document Page 36 of 42

## SCHEDULES AND EXHIBITS

**Schedule 5.3(d)**
Registered Intellectual Property

To be completed by Seller within 14 days of the Agreement Date. Include all patents, patent applications, trademark registrations, copyright registrations, and domain name registrations.

## SCHEDULES AND EXHIBITS

**Schedule 5.6(a)**
Employee Census

To be completed by Seller within 14 days of the Agreement Date. Include each employee's name, position, and employment classification (full-time/part-time).

## SCHEDULES AND EXHIBITS

**Schedule 5.7**
Pending Litigation

To be completed by Seller. Identify all pending or threatened claims, actions, proceedings, or investigations against Seller or the Purchased Assets (excluding the Bankruptcy Case itself).

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



## SCHEDULES AND EXHIBITS

**Schedule 5.1(d)**
Key Employees

To be designated by Purchaser within 10 Business Days of the Agreement Date. Identify employees by name, role, and classification ("Critical" or "Important") for purposes of Section 7.6 (Key Employee Transition).



Case 26-00362-DSC11 Doc 83 Filed 11/02/26 Entered 11/02/26 14:10:06 Desc Main Document Page 40 of 42

## SCHEDULES AND EXHIBITS

**Exhibit A**

Revenue Baseline

To be attached prior to execution. Sets forth the specific monthly gross recurring processing revenue figure as represented by management of GasPos, Inc. in connection with the negotiation of this Agreement, including the basis of calculation, period of measurement, and any customer-level detail provided by management. This Exhibit constitutes the agreed Revenue Baseline for purposes of the Material Adverse Effect definition. Monthly gross revenue = $220.000

***[ End of Agreement ]***

Docusign Envelope ID: C0AEB0B7-CADF-8215-8325-CF1AA350981C



**DRAFT — FOR DISCUSSION PURPOSES ONLY**



Case 26-00362-DSC11 Doc 83 Filed 11/02/26 Entered 11/02/26 14:10:06 Desc Main
Document Page 42 of 42